IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | CASE NO. BK15-82016 |
| CHARLES LEONARD and ) | A17-8026 |
| MARGARET LEONARD, ) | |
| ) | CHAPTER 7 |
| Debtor(s). ) | |
| RICHARD D. MYERS, Trustee of the ) | |
| Charles & Margaret Leonard Chapter 7 ) | |
| bankruptcy estate, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| CINCH CATTLE COMPANY, LLC; ) | |
| RIVERSIDE CATTLE CO., LLC; and ) | |
| BRIAN WITT, ) | |
| ) | |
| Defendants. ) | |

ORDER

This matter is before the court on the Chapter 7 trustee's motion for summary judgment (Fil. No. 47) and resistance by the defendants (Fil. No. 50). David J. Skalka represents the plaintiff, and Erin Ebeler Rolf represents the defendants. Evidence and briefs were filed and, pursuant to the court's authority under Nebraska Rule of Bankruptcy Procedure 7056-1, the motion was taken under advisement without oral arguments.

The motion is granted against Cinch Cattle Company, LLC.

This is an adversary proceeding to avoid and recover alleged post-petition transfers pursuant to 11 U.S.C. §§ 549(a) and 550(a).[1] The parties to this case were all in the business of buying and

---

[1]Those sections provide:

    (a) [T]he trustee may avoid a transfer of property of the estate –
        (1) that occurs after the commencement of the case; and
        (2) . . .
            (B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a).

(continued...)

selling cattle. The trustee alleges that while the debtors' Chapter 11 bankruptcy case was pending, they issued six checks, totaling more than $350,000, from their debtor-in-possession checking account to defendant Cinch Cattle Company for the benefit of Cinch, Riverside Cattle Company, and Brian Witt, and the bankruptcy estate received no goods or services in exchange for the funds paid. These transfers were not authorized by the bankruptcy court, and were not made in the ordinary course of business under 11 U.S.C. § 363(c)(1) or otherwise made pursuant to the Bankruptcy Code. Rather, the trustee argues, the payments were made so Cinch could continue operating. Witt owned Riverside and Cinch, and the debtor Charles Leonard was running Cinch for Witt. Leonard also owed Witt money for pre-petition business transactions. The trustee now moves for summary judgment jointly and severally against Cinch, Witt, and Riverside. The defendants resist the motion on the basis that factual disputes exist with regard to the deposits allegedly made by Leonard into Cinch's bank account, as well as whether any defendant received more than it was entitled to and whether the actions of the defendants benefitted the bankruptcy estate.

This is a core proceeding under 28 U.S.C. §157(b)(2)(E), (F), and (O), and the parties consent to entry of final orders or judgments by the bankruptcy court.

The following facts are uncontroverted for purposes of this motion:

1. Debtors Charles and Margaret Leonard operated a sole proprietorship called Leonard Cattle Company ("LCC").

2. Cinch is a Nebraska limited liability company with its business offices in Nebraska.

3. Riverside is a Nebraska limited liability company with its business offices in Nebraska.

4. Riverside is a licensed and bonded broker of cattle.

5. Witt is a Nebraska resident and is the sole equity owner of both Cinch and Riverside.

6. Leonard and Witt were long-time personal friends.

---

[1](...continued)
Under § 550,

    (a) [T]o the extent that a transfer is avoided under section . . . 549 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –
        (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]

11 U.S.C. § 550(a).

7. Witt's brother TomWitt owns T.W. Cattle Co.

8. Brian Witt, Tom Witt, and their father own and operate a cattle sale barn called 3-State Stockyards, Inc., in Falls City, Nebraska; Brian Witt owns one-third of that enterprise.

9. Leading up to October 2015, LCC was the biggest non-Witt-family buyer of cattle from 3-State Stockyards.

10. In early October 2015, Pinnacle Bank closed LCC's accounts, which caused LCC to cease operations.

11. LCC owed Riverside $1,207,416.37, unsecured, and LCC claimed under oath to owe Witt $400,000.00 with $150,000.00 of that unsecured, as set forth in the debtors' bankruptcy schedules,

12. Neither Witt nor Riverside loaned the Leonards, as debtors in possession, any money.

13. Neither Witt nor Riverside have filed any proof of claims in the Leonards' bankruptcy case.

14. Cinch was formed on October 15, 2015.

15. Cinch was funded by a $500,000 loan from a revolving line of credit belonging to Witt and Riverside. Cinch's accounting records have no equity category for Witt. Leonard or his bookkeeper categorized the initial $500,000 as a long-term liability owed to Witt.

16. Cinch was formed in part to help Leonard with his financial problems.

17. Witt authorized Leonard to operate Cinch.

18. CDL Cattle Company LLC is a Nebraska limited liability company formed on October 15, 2015.

19. Tammy Nichols, an employee of CDL, managed Cinch's accounting with electronic accounting software.

20. Witt had no review process, by himself or any agent for him, of the Cinch bank statements, until this litigation was filed .

21. Witt was the only party who signed checks for Cinch. Witt signed all Cinch checks, but did not necessarily know what the checks were for. Witt signed blank checks for Cinch and gave them to Leonard.

22. Witt had no review process, by himself or any agent for him, of the blank checks given to Leonard, until this litigation was filed.

23. The general agreement between Leonard and Witt was that Cinch would be shut down at the end of 2016 if the company failed to at least maintain the initial $500,000.

24. Witt told Leonard in December 2016 that he was closing Cinch for financial reasons, and Witt closed the Cinch bank account in April 2017.

25. The Leonards filed a voluntary Chapter 11 petition for relief in this court on December 14, 2015.

26. Leonard caused Cinch to issue checks to his bankruptcy attorneys in the amounts of $17,000 on October 28, 2015, and $15,000 on October 26, 2015, which Leonard considered loans.

27. $178,399 was transferred from Cinch's account number 722396801 at Horton National Bank to an account of Riverside at Horton National Bank on March 27, 2017, leaving $100 in account number 722396801.

28. Witt authorized the $178,399 transfer.

29. From at least the beginning of 2016 until Cinch was closed, Cinch was balance-sheet insolvent.

30. On December 21, 2016, the Leonards' Chapter 11 bankruptcy case was converted to Chapter 7 and Richard D. Myers was appointed as the Chapter 7 Trustee of the case on the same date.

The bankruptcy trustee may avoid post-petition transfers of estate property under 11 U.S.C. § 549(a)[2] if: (1) the subject property was property of the bankruptcy estate; (2) the property was transferred; (3) the transfer was made post-petition; and (4) the transfer was not authorized by the Bankruptcy Code or the bankruptcy court. *Seaver v. New Buffalo Auto Sales, LLC (In re Hecker)*, 459 B.R. 6, 11 (B.A.P. 8th Cir. 2011) (citing *Nelson v. Kingsley (In re Kingsley)*, 208 B.R. 918, 920 (B.A.P. 8th Cir. 1997) and *Schnittjer v. Burke Construction Co. (In re Drahn)*, 405 B.R. 470, 473 (Bankr. N.D. Iowa 2009)). The party asserting the validity of the transfer has the burden of proof. Fed. R. Bankr. P. 6001.

The function of § 549(a) is to protect the distribution priorities of the Bankruptcy Code and to promote the integrity of estate administration by subjecting unauthorized transactions to avoidance so the assets in question are restored to the estate. *Shields v. Duggan (In re Dartco, Inc.)*,

---

[2] Contrary to some of the defendants' arguments, subsections (b) and (c) of § 549 are inapplicable to the matter before the court.

197 B.R. 860, 865 (Bankr. D. Minn. 1996). The terms of the statute are clear and their application is straightforward, without being subject to the exceptions and affirmative defenses applicable to the trustee's other avoidance powers.

The trustee's motion concerns six checks totaling $353,750[3] that were written on the debtors' checking account at Wells Fargo Bank between August 15, 2016, and October 24, 2016, and made payable to Cinch Cattle Co. The first factor to consider under § 549(a) is whether the funds were property of the bankruptcy estate. When the Leonards filed their Chapter 11 bankruptcy petition on December 14, 2015, they listed a balance of $4,142.08 in a Wells Fargo checking account on their schedule of personal property. Property of the bankruptcy estate includes all legal and equitable interests of the debtors in property as of the commencement of the case, as well as property acquired by the debtors and earnings from services performed by the debtors after the Chapter 11 case was commenced but before it was converted to Chapter 7. §§ 541, 1115(a). Post-petition deposits into that checking account would therefore be property of the estate.

The defendants quibble over where the funds in the debtors' checking account came from, but there is no significant dispute that the funds in the account when these checks were written were property of the bankruptcy estate.

The second factor is whether the estate property was "transferred." A transfer is "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property." § 101(54). A transfer made by check is deemed to occur when the check is honored. *Stoebner v. Consumers Energy Co. (In re LGI Energy Sols., Inc.)*, 460 B.R. 720, 723 n.2 (B.A.P. 8th Cir. 2011) (citing *In re Pyatt*, 486 F.3d 423, 427 (8th Cir.2007) and *Barnhill v. Johnson*, 503 U.S. 393 (1992)). The defendants admit that each check was deposited into Cinch's account shortly after it was written. Nothing indicates any of the checks were not honored by the debtors' bank. Therefore, each check represents the transfer of estate funds.

The third factor, that the transfers occurred post-petition, is clearly established by the evidence and is not disputed.

The fourth factor is whether the transfers were unauthorized. They were not authorized by the court, and the defendants do not direct the court to any section of the Bankruptcy Code that might authorize such transfers. Some creditors have used the "ordinary course of business" provision of § 363(c)(1) to argue that post-petition transfers were authorized under the Code, *see Dartco*, 197 B.R. at 870, but the parties would be hard-pressed to make that argument here, particularly as the defendants admit that Leonard withdrew money from Cinch for his personal use, as well as his salary, in the form of unauthorized loans and questionable fees and expenses, and take the position that the transfers at issue were repayments for those withdrawals. *See* Defs.' Resp. B.R. ¶ 38.

---

[3]The final check at issue was written for $1,750. The trustee indicates $1,210 of that amount were funds belonging to Cinch, so the balance of $540 is the amount subject to § 549(a). That brings the total amount sought by the trustee to $352,540.

"Transfers are in the ordinary course of business if the transfers are within the 'interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business.'" *In re Patriot Coal Corp.*, 492 B.R. 518, 530 (Bankr. E.D. Mo. 2013) (quoting *Armstrong World Indus. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y. 1983)). Leonard's repayments to Cinch for withdrawals he made cannot be said to be in the ordinary course of Leonard's business, and there is no authorization within the Bankruptcy Code for these transfers.

Accordingly, the trustee has established each element of § 549(a), and the transfers may be avoided. The trustee also argues that the defendants should be jointly and severally liable for the amount of the avoided transfers because Riverside and Cinch are Witt's alter egos. "Alter ego" liability disregards the separate nature of a corporate entity. Whether to pierce a corporate veil is a legal determination that is governed by state law. *Stoebner v. Lingenfelter*, 115 F.3d 576, 579 (8th Cir. 1997).

Under Nebraska law,

> A court will disregard a corporation's identity only where the corporation has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another. . . .
>
> . . .
> Some of the relevant factors in determining whether to disregard the corporate entity on the basis of fraud are (1) grossly inadequate capitalization, (2) insolvency of the debtor corporation at the time the debt is incurred, (3) diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses, and (4) the fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity.

*Christian v. Smith*, 759 N.W.2d 447, 462 (Neb. 2008) (footnotes and internal citations omitted).

The Nebraska Supreme Court then described those four necessary elements in detail:

> The first element of the test, inadequate capitalization, means capitalization very small in relation to the nature of the business of the corporation and the risks entailed. Inadequate capitalization is measured at the time of incorporation. . . .
>
> The second factor used to determine whether a corporation's identity should be disregarded is whether the corporation was insolvent at the time the debt was incurred. A corporation is insolvent if it is unable to pay its debts as they become due in the usual course of its business, or if it has an excess of liabilities of the corporation over its assets at a fair valuation. . . .

> The third factor of the test to determine whether the corporate veil should be pierced is evidence of a diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses. When a principal shareholder appropriates and uses corporate funds and property for his personal purposes and thereby defrauds and causes damages to creditors, the shareholder can be held individually liable for corporate debt. . . .
>
> We turn now to the fourth prong of the test. If the corporation is a façade for the personal dealings of the shareholder and the operations of the corporation are carried on by the shareholder in disregard of the corporate entity, the shareholder may be individually liable for corporate debt. The separate entity concept of the corporation may be disregarded where the corporation is a mere shell, serving no legitimate business purpose, and is used as an intermediary to perpetuate fraud on the creditors.

*Id.* at 462–63 (footnotes and internal citations omitted).

With regard to the first element, the facts indicate Cinch was started with $500,000 from Witt and Riverside. There is no evidence this was inadequate capitalization at the time.

The second element, insolvency, favors the trustee, as the parties admit Cinch was insolvent throughout 2016 and certainly at the times these transfers were made.

The third and fourth elements concern the use of Cinch's assets by its sole owner. The trustee argues two main points here: that Witt benefitted because the transfers from Leonard to Cinch enabled Cinch to pay Witt for cattle, and because the balance of Cinch's bank account was transferred to Riverside when Cinch ceased operations. Because the $178,000 which was transferred to Riverside paid back a portion of the initial $500,000 from Riverside and Witt that was used to open Cinch, the trustee asserts the transfer was ultimately for Witt's benefit. The defendants respond to the issue of payment for the cattle by pointing out that the cattle sales occurred months after the transfers from Leonard, and that the cattle were sold to Cinch for the same price paid by Riverside, so Cinch was the only entity to realize an economic benefit.

While the transfer of Cinch's assets to Riverside did benefit Witt in the sense that it reduced the balance of the $500,000 loan taken out to initially fund Cinch, there is no evidence that Witt disregarded the separateness of the entities, or that Cinch was a mere shell serving no legitimate business purpose, or that Witt used Cinch or Riverside to perpetrate fraud. Rather, it appears that Witt created Cinch as an instrument to try to help Leonard make some money to pay back his pre-petition debts to Witt and Riverside. That effort ultimately failed, in part because Leonard was inclined to treat Cinch's funds as his own, but the evidence does not establish that Cinch and Riverside were alter egos of Witt. Accordingly, the trustee's summary judgment motion as to Riverside and Witt should not be granted.

On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Here, there are no genuine issues of material fact regarding Cinch, so the plaintiff is entitled to summary judgment against that entity. The transfers to Cinch are avoided, and the trustee may recover the avoided amount from Cinch. The issues regarding Riverside and Witt will be set for trial.

IT IS ORDERED: The Chapter 7 trustee's motion for summary judgment (Fil. No. 47) is granted against Cinch Cattle Company, LLC, in the amount of $352,540, and denied in all other respects. The Clerk shall schedule the remaining issues for trial. Separate judgment will be entered when all causes of action against all defendants are finally resolved.

DATED: September 26, 2018.

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the Court to:
    *David J. Skalka
    Erin Ebeler Rolf
    U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.